No. 68,597

THE KANSAS BAPTIST CONVENTION and HUGOTON ENERGY COR-
PORATION, *Appellees/Cross-Appellants*, v. MESA OPERATING
LIMITED PARTNERSHIP, *Appellant/Cross-Appellee*.

(864 P.2d 204)

Opinion
filed October 29, 1993.

*Donald W. Bostwick*, of Adams, Jones, Robinson and Malone Chartered,
of Wichita, argued the cause, and *Michael P. Dreiling*, of Neubauer, Sharp,
McQueen, Dreiling and Morain, P.A., of Liberal, was with him on the
briefs for appellant/cross-appellee.

*Richard D. Greene*, of Morris, Laing, Evans, Brock & Kennedy, Char-
tered, of Wichita, argued the cause, and *Robert W. Coykendall*, of the same
firm, was on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The plaintiffs, The Kansas Baptist Convention
(Baptists) and Hugoton Energy Corporation (Hugoton Energy),

brought this action against the defendant, Mesa Operating Limited Partnership (Mesa), to avoid or reform a 1952 contract for the unitization and operation of a 640-acre gas unit in Grant County. On a stipulated record, the district court terminated the contract as of May 25, 1988, and entered a judgment against Mesa for $185,220.86, representing plaintiffs' interest in gas sale proceeds from the termination date, minus operating costs and plus prejudgment interest. Mesa appealed. The Baptists and Hugoton Energy cross-appealed from the district court's determination of the amount of their recovery. The case was transferred to this court from the Court of Appeals pursuant to K.S.A. 20-3018(c).

The section of Grant County land at issue was devised to the Baptists by Otto Fischer upon his death in 1951. Fischer's heirs contested the will. An agreement was reached, and the Baptists conveyed one-half of the property to Fischer's heirs. Magnolia Petroleum Company (Magnolia) owned a portion of the minerals in several of the quarter sections. Magnolia leased its minerals to Panhandle Eastern Pipeline Company, which assigned the leases to Hugoton Production Company (Hugoton Production). According to Mesa, in 1969 it succeeded to all rights of Hugoton Production by virtue of a merger.

In 1952, the Baptists, Fischer's heirs, and Hugoton Production negotiated an agreement for development of the property. The Baptists were represented by an attorney, Robert S. Johnson, in the negotiations. On July 18, 1952, Hugoton Production sent Johnson a proposed contract. It was modified according to Johnson's suggestions, and, on July 21, 1952, the Baptists, Fisher's heirs, and Hugoton Production entered into the agreement which is the subject of this action.

The contract provided for creation of a 640-acre unit for natural gas production. It provided that Hugoton Production would obtain Magnolia's consent to the unitization. It provided that the "agreement shall extend for a term commencing on the date hereof and extending for such period of time as natural gas is or can be produced from the Unitized Area or operations for the development and production of natural gas are being conducted thereon."

The contract made Hugoton Production the sole operator of the unit. It required Hugoton Production "to produce the unitized area with reasonable diligence for the life of this agreement." It provided that Hugoton Production would "drill such additional well or wells on the Unitized Area as it should deem necessary" and would charge the other parties their proportionate shares of the costs and expenses incurred on the basis of the accounting procedure which was attached to the contract as Exhibit B and incorporated into it.

Ownership of the land and the minerals is described in the contract as follows:

| | |
|---|---|
| Baptists | surface and ½ minerals in two quarter sections, ¼ minerals in a third quarter section; |
| Fischer's heirs | surface and minerals in one quarter section, surface and ¼ minerals in a second quarter section; |
| Magnolia | ½ minerals in three quarter sections. |

The agreement provided that the parties owned the benefits of gas production in the following proportions, which differ from land and mineral ownership proportions:

| | |
|---|---|
| Baptists | 5/16; |
| Fischer's heirs | 5/16; and |
| Hugoton Production | 6/16. |

It also provided that the Baptists and Fischer's heirs would sell and Hugoton Production would buy any natural gas produced. The price was fixed at "10¢ per MCF [thousand cubic feet], measured at a pressure base of 16.4 pounds per square inch absolute [p.s.i.a.], with an assumed flowing temperature of sixty degrees (60°) Fahrenheit."

It provided that costs and expenses were to be borne by the parties in proportions equal to their proportions of gas ownership. Alternative methods were provided for satisfying the obligations for costs and expenses. The Baptists and Fischer's heirs could pay their proportionate shares of costs and expenses, or Hugoton could withhold gas purchase payments until reimbursed for costs plus interest.

Production from the first well on the unit (Baptist-Fischer 1-14) began in October 1953. The cost of the first well was

$24,500. This is a district court finding which is cited on appeal by Mesa and is not disputed by the other parties.

In 1971, Mesa acquired the mineral interests of the Fischer heirs. Since then, Mesa has received $11/16$ of the revenue from the unit.

· A second well (Baptist-Fischer 2-14) was drilled in 1972 at a cost of $43,000. At that time Mesa anticipated that the Baptists' share of the costs would have been recovered from their share of the income within a year.

In 1986, the Kansas Corporation Commission (KCC) issued orders which permitted the drilling of an additional well (sometimes referred to as an infill well) on each unit in the Hugoton gas field. This court upheld the KCC decision in *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 769 P.2d 1 (1989). In 1988, a third well was drilled at a cost of $174,100.

Like the drilling costs, operating costs have increased. In March 1987, before the third well was drilled, Mesa informed the Baptists that the overhead rates had changed from $30 to $340 per well per month. During the first three months of 1990, the average monthly charge to the Baptists was $982.75.

The market price of natural gas also has increased. "In October 1948 . . . the prevailing price for the gas in the [Hugoton] field was approximately five and one-half cents per M.c.f. based on 16.4 pounds p.s.i.a." *Matzen v. Hugoton Production Co.*, 182 Kan. 456, 458, 321 P.2d 576 (1958). *Pan American Petroleum Corporation v. Cities Service Gas Co.*, 191 Kan. 511, 512, 382 P.2d 645 (1963), involved a gas purchase contract in which the price was set at 8.4¢/Mcf until June 1961, when the price would increase to not less than 12¢/Mcf. The plaintiff contended that the fair and reasonable price as of June 1961 was 19¢/Mcf at 14.65 p.s.i.a.; the defendant contended it was 12¢/Mcf at 16.4 p.s.i.a. 191 Kan. at 512-13. This court affirmed the district court's decision that 14.5¢/Mcf at 14.65 p.s.i.a. was a reasonable price for the five-year period beginning in June 1961. 191 Kan. at 513, 522. The parties have stipulated that, "[i]n 1990, the average weighted market price of natural gas produced from the unitized area including the Baptist-Fischer wells and received by Mesa was $1.52/Mcf."

The current operating expenses plus the drilling costs and interest of the third well will never be recovered by the 10¢/Mcf gas purchase price provided in the 1952 agreement.

In March 1987, Mesa sent to the Baptists an Authorization for Expenditure in the amount of $169,800 for the drilling of the third well (Baptist-Fischer 3-14). In May 1988, Mesa revised the Authorization for Expenditure to $174,100. The first gas was sold from the third well on August 19, 1988.

In 1986, a Mesa internal memorandum concluded that the combination of lower well production, contemplated adjustment in operating expenses charges, and contemplated third well costs would make the Baptists' ownership worthless. In 1987, before the third well was drilled, a Mesa representative wrote to the Baptists about the loss which the Baptists could anticipate "[b]ecause of the economics of the existing contracts" and offered $5,000 for their interest. In March 1988, Mesa offered $10,000 for the Baptists' interest.

On May 20, 1988, the Baptists sold their entire interest to Hugoton Energy for $15,000. On August 3, 1988, Hugoton Energy sent a demand letter to Mesa in which it took the position that the 1952 agreement had terminated due to commercial impracticability. In September 1988, a "Corrected Mineral Deed" was signed by the Baptists and Hugoton Energy which reduced from 100 to 90 the percentage of the Baptists' interest which was transferred. Immediately after the 10% interest had been restored to the Baptists, this action was filed by the Baptists and Hugoton Energy as coplaintiffs.

The district court granted the motion for partial summary judgment of the Baptists and Hugoton Energy and terminated the contract. The pertinent part of the district court's decision states:

"This court concludes that, as a matter of law, all parties to a contract are obligated to act in good faith. The court further finds, as a matter of law, that the operator of a gas operating unit involved in this instance is obligated to proceed with consideration not only for its interest but for that of any participating owner in the unit.

"Based upon the history of production and prior costs, it must be noted that prior production from the Chase and Council Grove formations resulted in an operating margin for the plaintiffs' interest after considering their revenues for the production and operating costs. Where the agreement is predicated as operating 'for the joint benefit of the parties hereto,' the

operator is restricted in its operation of the unit to operating the wells under such circumstances as will allow for maximum return of all the parties and not just that of the operator. Pursuant to the stipulations, the defendant had knowledge that drilling the infill well at the current cost would extinguish the plaintiffs' economic benefits under the agreement and permit the defendants to withdraw the mineral interest of the plaintiffs without any compensation. Although the agreement required cost of operation and production to be taken from proceeds so that plaintiffs would not incur a net liability, the operation, as anticipated by the defendant, would effectively transfer all natural gas owned by the plaintiffs to the defendant. Such could not have been anticipated by the parties at the time of entering this agreement and renders plaintiffs incapable of performing their obligations because their reserves are insufficient to pay their share of costs. A view of the communications leading up to the agreement which allows for the monthly operating charge must be read in the context of the prices of that time. There could have been no meeting of the minds in anticipation of an operating cost which would increase more than thirty times the original assessment and for production costs which would exceed seven times that of the initial production cost.

"The court finds, therefore, that this contract was breached by the defendant in drilling the infill well and extinguishing the plaintiffs' interest in the gas unit. The court finds that there was no meeting of minds on these vastly increased costs, and that there is no mutuality in contract obligations if an operator has an unfettered right to increase costs and eliminate the plaintiffs' participating interest in the unit.

"The stipulations entered by the parties are adopted as the facts. And in addition to the above, the plaintiffs' brief in support of [their] motion for partial summary judgment is adopted as further conclusions of this court."

The district court specified May 25, 1988, the date on which drilling of the third well began, as the date when Mesa breached the contract. The contract became void as of that day. The Baptists and Hugoton Energy were awarded $185,220.86. With respect to the money judgment, the district court stated:

"This amount includes payments due for production through the month of April 1992 (except for the proceeds from the sale of helium for the month of April 1992) and interest through April 30, 1992. Plaintiffs are entitled to further judgment in the amount of $5/16$ths of the proceeds from the sale of the products of the wells, less reasonable operating and production expenses, for the period from May 1, 1992, to the date of this Journal Entry, with additional prejudgment interest.

"B. The defendant is ordered to pay to the plaintiffs $5/16$ths of proceeds of future production from the Baptist-Fischer wells, within 30 days of the date upon which Mesa receives those proceeds, after deduction of plaintiffs' $5/16$th of the reasonable and customary costs and expenses of operation."

Mesa raises three issues on appeal: (1) Did the district court err in terminating the contract? (2) Do the Baptists have standing to seek avoidance or reformation of the contract? and (3) Do equitable principles of waiver and estoppel bar the relief sought by the Baptists and/or Hugoton?

The issue raised by plaintiffs on cross-appeal is whether they are entitled to $1/2$ of the gas production rather than the $5/16$ granted by the district court.

To summarize, Mesa contends that the contract should not have been avoided by the district court. In its first issue, Mesa argues that two of the grounds stated by the district court, Mesa's breach of good faith and no meeting of the minds on increased costs, do not support termination of the contract. In addition, Mesa argues that a ground which had been advocated by the Baptists and Hugoton Energy in the district court, commercial impracticability under K.S.A. 84-2-615, does not support termination of the contract.

The Baptists and Hugoton Energy respond that there are eight theories which justify termination of the contract: (1) failure of essential purpose, (2) failure of consideration, (3) lack of mutuality, (4) commercial impracticability, (5) breach of obligations by Mesa, (6) no meeting of minds on changed circumstances, (7) termination by the contract's own terms, and (8) equitable principles.

As to the second issue, the Baptists contend that they not only have standing but, as the owners of mineral interests, they are a necessary party. As to the third issue, the Baptists and Hugoton Energy argue that Mesa cannot invoke equitable principles because it is trying to promote rather than prevent injustice.

The Baptists and Hugoton Energy cross-appeal, seeking $1/2$ rather than $5/16$ of the gas produced from the unit. They argue that the provisions of the 1952 contract are not severable and that property law, which controls if the contract is terminated, requires division of the gas by half. Mesa responds that the issue is moot unless the court affirms termination of the contract. In that case, Mesa argues, the Baptists and Hugoton Energy are estopped from seeking termination of the contract and then reaping a windfall. Moreover, the various provisions of the contract, unitization and operation and gas purchase, are severable.

We first consider if the district court erred in terminating the contract. The construction of a written instrument is a question of law. *Akandas, Inc. v. Klippel*, 250 Kan. 458, 464, 827 P.2d 37 (1992). Thus, irrespective of the district court's construction, "on appeal a contract may be construed and its legal effect determined by the appellate court." *Mark Twain Kansas City Bank v. Cates*, 248 Kan. 700, 704, 810 P.2d 1154 (1991).

The district court decided this case on motions, stipulations, written documents, and deposition transcripts. In these circumstances, the appellate court has "the same opportunity to weigh the evidence as did the district court." *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 250 Kan. 754, 762, 829 P.2d 907 (1992). Thus, our review is de novo. 250 Kan. at 762.

Mesa contends that this court will not impose an obligation of good faith which would override express contract terms. It relies principally on *Morriss v. Coleman Co.*, 241 Kan. 501, 514-15, 518, 738 P.2d 841 (1987), and *General Aviation, Inc. v. Cessna Aircraft Co.*, 703 F. Supp. 637, 644 (W.D. Mich. 1988), *aff'd in part and remanded* 915 F.2d 1038 (6th Cir. 1990). Mesa cites *Davis v. TXO Production Corp.*, 929 F.2d 1515 (10th Cir. 1991), as an oil and gas case in which the court decided that there can be no breach of an implied duty of good faith to perform under a joint operating agreement absent a breach of a specific contractual provision. Mesa's point is that the contract expressly provided for the drilling of additional wells and the allocation of costs, as well as the fixed price for gas. Thus, according to Mesa, any implied duty cannot override the expressed obligations.

*Morriss* is a wrongful discharge action. *Morriss* provided the occasion for this court to consider whether it should recognize the implied covenant of good faith and fair dealing in the area of termination of employment contracts. 241 Kan. at 514. A majority of the court, with Chief Justice Prager writing the opinion, "concluded that the principle of law stated in Restatement (Second) of Contracts § 205 [1979], that every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement, is overly broad and should not be applicable to employment-at-will contracts." 241 Kan. at 518.

Six months later, in *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987), Chief Justice Prager wrote that "the

modern trend is to apply the duty of good faith and fair dealing in every contract." He quoted the following discussion of the duty from what is now 17A Am. Jur. 2d, Contracts § 380:

" 'Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties. Accordingly, whenever the co-operation of the promisee is necessary for the performance of the promise, there is a condition implied that the co-operation will be given. Indeed, it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out. When one undertakes to accomplish a certain result he agrees by implication to do everything to accomplish the result intended by the parties. If the giving of notice is requisite to the proper execution of a contract, a promise to give such notice will be inferred. Moreover, there is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee. However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing.' " 242 Kan. at 222.

The court concluded that the lessor was obligated to take the steps necessary to further the commercial development which was contemplated in the lease, and, in addition, she was obligated to avoid preventing that use. 242 Kan. at 222. McLean's refusal to certify that the lease was in full force and effect, which effectively blocked Bonanza's effort to obtain financing for its commercial development, was held to be a violation of her contractual obligation. The obligation which was breached was her duty of good faith and fair dealing. 242 Kan. at 222.

In *Daniels v. Army National Bank*, 249 Kan. 654, 658, 822 P.2d 39 (1991), a lender liability action, the court stated:

"Kansas courts imply a duty of good faith and fair dealing in every contract. Parties shall not 'intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987)."

Of these cases, only *Morriss* might be construed to stand for the proposition that the court will not impose an obligation of

good faith which would override express contract terms. This court's rejection of the principle of a good faith obligation is restricted to the area of employment-at-will.

In 5 Williams & Meyers, Oil & Gas Law (1992), Williams and Meyers devote an entire volume of their treatise to implied covenants. They trace the debut of the concept in oil and gas law to an 1889 Pennsylvania opinion, *Stoddard v. Emery*, 128 Pa. 436, 18 A. 339 (1889), and report that it "reached full cruising speed" in *Brewster v. Lanyon Zinc Co.*, 140 Fed. 801 (8th Cir. 1905). 5 Williams & Meyers, § 802, p. 4. *Brewster* was filed in the district court in Allen County, Kansas, and removed to federal court; the opinion reported at 140 Fed. 801 is an appeal from the Circuit Court of the United States for the District of Kansas. 140 Fed. at 803. According to the commentators, "[t]he continued vitality" of *Brewster* warrants full discussion of the case. 5 Williams & Meyers, § 802, p. 5.

Brewster leased her land for oil and gas exploration for a five-year primary term, receiving a royalty for each well from which gas was sold. Lanyon Zinc had drilled one well immediately before the end of the primary term. Brewster sued to cancel the lease. She alleged breach of duty to protect against drainage and to develop. The Court of Appeals dealt with "[t]wo issues of present significance . . . : (1) the basis for imposing a duty . . . when the lease is silent on the subject, and (2) the test for determining whether the duty has been breached." 5 Williams & Meyers, § 802, p. 5.

The basis for the duty was set out as follows:

"The implication necessarily arising from these [lease] provisions—the intention which they obviously reflect—is that if, at the end of the five-year period prescribed for original exploration and development, oil and gas, one or both, had been found to exist in the demised premises in paying quantities, the work of exploration, development, and production should proceed with reasonable diligence for the common benefit of the parties, or the premises be surrendered to the lessor. That this was of the very essence of the contract is shown by the extensive character of the grant, which was without limit as to time and included all the oil and gas in or obtainable through the demised premises; by the provisions for the payment of substantial royalties in kind and in money on the oil produced and saved and the gas used off the premises, which, as contrasted with the consideration paid when the lease was executed, shows that the promise of these royalties was the controlling inducement to the grant; and by the provisions contem-

plating the drilling and operation of wells, the production and transportation of oil and gas, and the prosecution of that business subject to the restrictions prescribed.

"Considering the migratory nature of oil and gas, and the danger of their being drawn off through wells on other lands if the field should become fully developed, all of which must have been in the minds of the parties, it is manifest that the terms of the lease contemplated action and diligence on the part of the lessee. There could not well have been an express stipulation as to the number of wells to be drilled, as to when the wells, other than the first, should be drilled, or as to the rate at which the production therefrom should proceed, because these matters would depend in large measure upon future conditions, which could not be anticipated with certainty, such as the extent to which oil and gas, one or both, could be produced from the premises, as indicated by the first well and any others in the vicinity, the existence of a local market or demand therefor or the means of transporting them to a market, and the presence of wells on adjacent lands capable of diminishing or exhausting the supply in the natural reservoir. The subject was, therefore, rationally left to the implication, necessarily arising in the absence of express stipulation, that the further prosecution of the work should be along such lines as would be reasonably calculated to effectuate the controlling intention of the parties as manifested in the lease, which was to make the extraction of oil and gas from the premises of mutual advantage and profit. Even in respect of the first well, if oil or gas was found in paying quantity, there was no express engagement to operate it; but that it was intended to be operated was plainly implied in the engagement to pay royalties to be gauged according to the production of oil and the use of gas. Whatever is necessary to the accomplishment of that which is expressly contracted to be done is part and parcel of the contract, though not specified." 140 Fed. at 810-11.

The test formulated for determining whether the duty was breached by Lanyon Zinc is known as the prudent operator standard. The United States Supreme Court quoted it with approval and stated that it "has been generally adopted in decisions of federal and state courts." *Sauder v. Mid-Continent Corp.*, 292 U.S. 272, 280, 78 L. Ed. 1255, 54 S. Ct. 671 (1934). In *Brewster*, the Court of Appeals stated:

"The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. This is the rule in respect of all other contracts where the time, mode, or quality of performance is not specified, and no reason is perceived why it should not be equally applicable to oil and gas leases. . . .

"... *No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required.* [Emphasis added.] ... Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required. *A plain and substantial disregard of this requirement constitutes a breach of the covenant for the exercise of reasonable diligence, which, as before shown, is also made a condition of the lease under consideration.* [Emphasis added.]" 140 Fed. at 814-15.

The commentators conclude their discussion of its meaning and effect by stating: "[T]he prudent-operator standard has the same function in oil and gas litigation as the reasonable man standard has in negligence litigation." 5 Williams & Meyers, § 806.3, p. 42. They list the following Kansas cases as adopting and applying the prudent operator standard: *Temple v. Continental Oil Co.,* 182 Kan. 213, 320 P.2d 1039, *reh. denied* 183 Kan. 471, 328 P.2d 358 (1958); *Fischer v. Magnolia Petroleum Co.,* 156 Kan. 367, 133 P.2d 95, *aff'd* 156 Kan. 722, 137 P.2d 139 (1943); and *Myers v. Shell Petroleum Corp.,* 153 Kan. 287, 110 P.2d 810 (1941).

*Brewster* and the later Kansas cases applying its standard involved underachieving lessees. The present case involves an overreaching lessee. Mesa is alleged to have exceeded the bounds of reasonable operation by drilling an additional well and by spending more to drill and operate it than the lessors ever could recover from their contractually fixed gas sale price.

Mesa's position is that the drilling of the third well and the resulting costs occasioned the complaints of the Baptists/Hugoton Energy; the drilling and the allocation of costs were expressly authorized by the contract; hence, no duty needs to be implied to accomplish that for which the parties contracted. Moreover, no duty may be implied which would displace the parties' express stipulation.

The pertinent provisions of the contract lie in Article III:

"Hugoton [Production, now Mesa,] shall have full and complete control and shall conduct and manage the development and operations of the Unitized Area for the production of natural gas for the joint account of the parties hereto. It shall drill such additional well or wells on the Unitized Area as

it should deem necessary from time to time and shall pay and discharge all costs and expenses incurred and shall charge the other parties hereto their proportionate share upon the cost and expense basis provided for in the schedule of accounting procedure attached hereto as 'Exhibit B', which is, by reference, made a part of this agreement to the same extent as if copied herein in full. [Mesa] shall at all times keep the joint interests of the parties hereto in and to said minerals and equipment thereon free of all labor and mechanics' liens and encumbrances. The judgment and discretion of [Mesa] exercised in good faith and without negligence shall be the limit of its liability to the other parties hereto for any act done or omitted to be done in good faith in the performance of any of the provisions of this agreement."

The obvious response to Mesa's argument is that the contractual authority for Mesa's drilling additional wells is conditioned on its deeming them necessary in the good faith exercise of its judgment. Article III places complete control of development and management of the gas unit in Mesa, and it limits Mesa's liability to the other parties to the contract for "any act done . . . in good faith" to its "judgment and discretion . . . exercised in good faith and without negligence." Based on *Brewster* and the line of Kansas cases which includes *Temple*, *Fischer*, and *Myers*, a duty of good faith could be implied in Mesa's assumption of "complete control." We find it unnecessary to imply a duty of good faith, however, where the parties have expressly stipulated that the gauge of Mesa's liability will be its good faith. The parties contemplated that Mesa would exercise its judgment and discretion in good faith and that Mesa would act "in good faith in the performance of any of the provisions of th[e] agreement."

In the present case, both the Baptists/Hugoton Energy and Mesa quote from *Kham & Nate's Stores No. 2 v. First Bank*, 908 F.2d 1351 (7th Cir. 1990). The Baptists and Hugoton Energy selected the following statement: " 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." 908 F.2d at 1357. Mesa quoted the sentence which preceded it: "Although courts often refer to the obligation of good faith that exists in every contractual relation [citations omitted], this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document." 908 F.2d at 1357.

Mesa argues that its drilling of the third well was not simply an exercise of sound judgment, but was necessary pursuant to the 1986 orders of the KCC. We do not agree. Mesa asserts that "the KCC has specifically found that an infill well is necessary to effectively and efficiently drain a Hugoton gas unit, to prevent waste and to protect correlative rights." Mesa did not provide a copy of the KCC order, but rather refers to this court's decision affirming it, *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 769 P.2d 1 (1989). Mesa cites the following passage: "The Commission found an additional well on each B.P.U. [basic proration unit] necessary for effective and efficient drainage to prevent waste and protect correlative rights pursuant to K.S.A. 1987 Supp. 55-703(a)." 244 Kan. at 164. This court concluded that there was substantial competent evidence to support the KCC's finding on waste but not to support its finding that infill drilling is required to protect correlative rights. 244 Kan. at 184, 186. K.A.R. 82-3-101(a)(17) (1992 Supp.) defines correlative rights to mean

"the privilege of each owner or producer in a common source of supply to produce from that supply only in a manner or amount that will not:
(A) Injure the reservoir to the detriment of others;
(B) take an undue proportion of the obtainable oil or gas; or
(C) cause undue drainage between developed leases."

The Baptists/Hugoton Energy cite other language from the same opinion: "[T]he Commission's order does not effect an involuntary change in existing property rights, but merely authorizes the *optional* drilling of a second well on each production unit after a justification hearing of which adjoining landowners are given personal notice." (Emphasis added.) 244 Kan. at 173.

The KCC's order of April 1986 amended the standing Basic Proration Order to allow the drilling of additional wells. A portion of the April order, which links geological evidence with the KCC's conclusion, was reprinted in *Southwest Kan. Royalty Owners*. It describes the Hugoton gas field as a discontinuous reservoir with isolated productive zones, even within proration units. The Order continues:

" '[A] significant portion of the productive intervals within each proration unit, although in pressure communication with the existing well, consists of poor, low permeability reservoir rock which prevents one well from effec-

tively or efficiently draining the proration unit. To the end of preventing waste, an infill well on each basic proration unit of 480 acres or more within the field is necessary to effectively and efficiently drain portions of the reservoir on each proration unit in the field which cannot be effectively and efficiently drained by the existing well on said proration unit.' " 244 Kan. at 162-63.

The last sentence quoted is not a model of clarity, but the reasonable interpretation is that on units which cannot be effectively drained by the existing well, an additional well is necessary for effective drainage. It does not mean that an additional well is necessary for effective drainage on each unit of the field.

In July 1986, the KCC modified its April order "affirming its amendment to the B.P.O. with regard to the drilling of an *optional* infill well on each B.P.U. of 480 acres or more, but modifying the April order in some respects." (Emphasis added.) 244 Kan. at 163. In the July order, the KCC determined that "studies of approximately 100 wells were sufficient to make a projection from which it issued a field-wide order" rather than conduct an individual hearing on each unit. 244 Kan. at 163.

Mesa argues that, in light of the KCC order, its decision to drill an additional well cannot, as a matter of law, constitute a breach of any implied obligation of good faith. As previously indicated, the obligation to exercise good faith is not implied but, rather, expressly required by the contract. Further, unless the KCC order required the drilling of infill wells on each unit, and it clearly does not, Mesa's argument would not be sound. The determination whether its discretion was exercised in good faith is dependent upon consideration of factors specific to the unit and not just on the KCC's field-wide projection.

Mesa postulates that its failure to drill the additional well might have caused Magnolia to cancel its leases on the ground that Mesa was not operating the unit with due diligence. We find no merit in this argument. It is nothing more than speculation what Magnolia might have done, and a reasonable exercise of discretion in the unit's operation should have balanced the benefit and detriment to all interested parties.

It is evident that Mesa does not quarrel with Kansas courts' imposition of an obligation of good faith operation of a gas lease. Mesa speculates that a ground upon which Magnolia might at-

tempt to cancel the leases is breach of Mesa's "implied obligation to prudently develop the unit. *Parkin v. Kansas Corporation Comm'n*, 234 Kan. 994, Syl. ¶ 6 and 7, 677 P.2d 991 (1984)." Those syllabus paragraphs state:

" 'Unit operation' means not only the process of placing a number of oil and gas leases together, centralizing management, pumping the wells and dividing the royalty proceeds according to schedule, it also means the good faith operation and prudent development of the unit." Syl. ¶ 6.

"On the hearing of an application to terminate its order unitizing oil and gas leases pursuant to K.S.A. 55-1301 *et seq.*, the Kansas Corporation Commission must determine whether a unit was being operated in good faith, whether it was being prudently developed at the time the application was filed, and whether the purposes of the compulsory unitization act, K.S.A. 55-1301 *et seq.*, continue to be served." Syl. ¶ 7.

These principles enjoy long and enduring vitality, as can be seen in the court's quoting Syl. ¶ 6 from *Parkin* in the recent case of *Akandas, Inc. v. Klippel*, 250 Kan. 458, 465, 827 P.2d 37 (1992), and in the following quote from a venerable case:

"The doctrine in this state is now well established that what is required of a lessee, under the implied covenant to develop an oil and gas lease, is reasonable diligence in doing what would be expected of an operator of ordinary prudence, *in the furtherance of the interests of both lessor and lessee. (Fischer v. Magnolia Petroleum Co.*, 156 Kan. 367, 133 P.2d 95; *Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 110 P.2d 810; and *Berry v. Wondra*, 173 Kan. 273, 246 P.2d 282.) Under this rule neither the lessor nor the lessee of an oil and gas lease is the sole judge of what constitutes prudent development of the tract." *Temple v. Continental Oil Co.*, 182 Kan. at 220.

Finally, Mesa argues that the district court's termination of the agreement constitutes a forfeiture. According to Mesa, courts abhor forfeitures, particularly for breaches of implied obligations. Mesa relies on *Christiansen v. Virginia Drilling Co.*, 170 Kan. 355, 361, 226 P.2d 263 (1951), where it was stated:

"Instances are rare where equity will enforce a forfeiture for breach of an implied covenant; it will never do so where less drastic redress will satisfy the demands of justice, and forfeitures of oil and gas leases for breach of implied covenants are seldom decreed, and never arbitrarily. (*Alford v. Dennis*, 102 Kan. 403, 170 Pac. 1005; *Greenwood v. Texas-Interstate P.L. Co.*, [143 Kan. 686, 56 P.2d 431], and cases therein cited.)"

Mesa suggests that some other, unspecified form of relief would be more equitable in the present case. The Baptists/Hugoton

Energy respond that there is nothing inequitable or penal in the district court's refusal to sanction Mesa's extinguishing their interests in the unit and .effectively transferring them to itself.

In *Temple*, the landowners and other royalty owners sought to cancel an oil and gas lease. This court observed that "[w]hile equity abhors forfeitures it likewise abhors injustice." 182 Kan. at 236. The court was receptive, therefore, to the suggestion that the following decree be entered: "[U]nless the defendants herein commence a well on the ten-acre tract here in controversy on the leased premises by the 25th day of May, 1958, and complete the same as soon as is reasonably possible, the lease as to such ten-acre tract shall be cancelled." 182 Kan. at 236-37.

Mesa contends that there are detailed express provisions in the contract which anticipate increased costs. It singles out phrases from the accounting procedure, such as "current replacement cost [of the same kind of material]," as illustrating its position. Mesa cites *Tenneco Oil Co. v. Bogert*, 630 F. Supp. 961, 969 (W.D. Okla. 1986), for the proposition that, where a contract contains detailed provisions, a court will not assume that the parties were incapable of drafting a contract which reflected their desires. Mesa also contends that the reasonableness of its charges is not questioned by the Baptists/Hugoton Energy. Mesa points out that "no meeting of the minds" is a phrase more typically associated with the inquiry whether a contract ever came into existence.

In the present case, the district court stated that it "could not have been anticipated by the parties at the time of entering this agreement" that the operation "would effectively transfer all natural gas owned by the plaintiffs to the defendant." The district court further stated that "[t]here could have been no meeting of the minds in anticipation of an operating cost which would increase more than thirty times the original assessment and for production costs which would exceed seven times that of the initial production cost." The Baptists/Hugoton Energy contend that the district court found that the parties had mutually and mistakenly assumed that costs would not overwhelm the royalty owners' income.

In *Estate of Link v. Wirtz*, 7 Kan. App. 2d 186, 638 P.2d 985, *rev. denied* 231 Kan. 800 (1982), the district court reformed the rental rate provision in a lease; the Court of Appeals reversed.

*Estate of Link* involved a 20-year lease for a tract of land. The period began in 1958, and Wirtz, the lessee, had the option to extend the term for another 20 years. Wirtz entered into the lease agreement with Deutsch, who had given a power of attorney to a granddaughter, Gillen, when he suffered a stroke. Nevertheless, Gillen was not involved in or consulted about the making of the lease. Annual rent was set at $200. Deutsch died, the land went to Link, Wirtz notified Link that he wanted to extend the term, Link refused, Link died, and the executrix of Link's estate filed an action to avoid or reform the lease. 7 Kan. App. 2d at 186-87. A court-appointed panel of appraisers set the fair market rental at $720 per year. 7 Kan. App. 2d at 188. The parties stipulated that the rent was conscionable in 1958. According to the Court of Appeals, "[t]he mere passage of time made the rental term appear to be unfair. Apparently time had turned this lease into a bad bargain." 7 Kan. App. 2d at 189. Although the executrix sued to avoid or reform the lease, the Court of Appeals quoted C.J.S. at length on the principles of specific performance. 7 Kan. App. 2d at 189-90. The Court of Appeals distinguished *Jensen v. Southwestern States Management Co.*, 6 Kan. App. 2d 437, 629 P.2d 752, *rev. denied* 230 Kan. 818 (1981), on the ground that the parties to the lease should have anticipated increased value of property by extrapolating from the economic climate in 1958. 7 Kan. App. 2d at 190. Moreover, the Court of Appeals reasoned, "[t]he record further reveals that no real hardship or injustice would result from the enforcement of the lease." 7 Kan. App. 2d at 190.

The Court of Appeals noted that the doctrine of unconscionability in private contracts exists in Kansas through the adoption of K.S.A. 16a-5-108 of the Uniform Consumer Credit Code, K.S.A. 1992 Supp. 50-627 of the Consumer Protection Act, K.S.A. 58-2544 of the Residential Landlord and Tenant Act, and, most importantly, K.S.A. 84-2-302 of the Uniform Commercial Code. The court quoted from *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 757-58, 549 P.2d 903 (1976):

" 'Although the UCC's application is primarily limited to contracts for the present or future sale of goods (K.S.A. 84-2-102; 84-2-105), many courts have extended the statute by analogy into other areas of the law or have used the doctrine as an alternative basis for their holdings.' The court then

proceeded to use 84-2-302, the UCC unconscionability section, as a guide in a non-UCC case. We likewise use statutory unconscionability provisions as a guideline." 7 Kan. App. 2d at 188.

Although further noting that the cited statute provides that the court look to the time the contract is made in determining if a contract is unconscionable, the court said:

"Despite the general rule that the trial court will look to the circumstances as they existed at the inception of the contract rather than in the light of subsequent events to determine whether the agreement is conscionable, a court is not powerless in equity to remedy that which it perceives as present unconscionability.

"Although this case deals with a party seeking to have the court reform a contract, the rules concerning specific performance of contracts are applicable. In its discussion concerning specific performance of contracts, C.J.S. states:

'Specific performance of a contract is never decreed when its enforcement would be inequitable or unconscionable, or produce injustice or hardship, or where the specific performance of the contract would operate oppressively as to either party, even though there is no sufficient ground for rescission or cancellation. . . . Equity will not assist a party seeking to enforce a hard bargain. The fact that the inequity arises from provisions of the contract or the performance thereof, or from external facts or circumstances is immaterial. The harshness or oppression which would entail sufficient ground to deny specific performance need not arise from fraud, mistake, or accident in the making of the contract.

'The foregoing rules are nevertheless subject in their application to some limitations that arise out of the facts of particular cases. The rule against specific performance has been said to apply only where the consequences of enforcement cannot be deemed to have been contemplated by the parties when the contract was made. Hence, hardship, fairly and voluntarily assumed as a part of the contract sought to be enforced, cannot prevail to stay a specific performance thereof, and a bad bargain, in the absence of fraud, will not relieve a party from specific performance.' 81 C.J.S., Specific Performance § 20, pp. 737-740." 7 Kan. App. 2d at 189-90.

In *Jensen*, 6 Kan. App. 2d 437, plaintiffs owned certain land and the Management Co. owned the mineral rights. The more than 55-year-old mineral deeds permitted the company to use the surface as well as the minerals upon the payment of $70-75/acre. The court concluded that the price had become inequitable and that the company would be required to pay the current market value if it ever decided to use the surface. The court reasoned as follows:

"To condition a grant of specific performance upon paying an adequate price rather than a price set before the value of money has eroded by inflation is common. 71 Am. Jur. 2d, Specific Performance § 88, p. 120. Of many circumstances calling for a price adjustment in cases, the following are noted: The contract price would work a hardship not within contemplation of the parties at the time of making the contract. [Citation omitted.] When specific performance is denied, the court is allowed considerable latitude in making orders to obtain equity between the parties. [Citation omitted.] Specific performance is properly denied when land is worth about $1,000 or $1,500 per acre and the contract price is only $361.72. [Citation omitted.] A contract will not be specifically enforced if it 'drives too hard a bargain for a court of conscience to assist.' [Citation omitted.]" 6 Kan. App. 2d at 443.

Here, the district court correctly found that the contract was breached when Mesa commenced to drill the third well on May 25, 1988. Although the parties could have anticipated some change in the drilling and operating costs and the market price for natural gas, we agree with the district court that the parties could not have reasonably foreseen at the time of entering the contract the tremendous increase that has occurred. However, we do not find that termination of the contract is the proper remedy based upon the facts in this case.

We agree with the district court that this is a unique case. An equitable remedy is difficult to find and harder to apply to the facts in the present case. We acknowledge that courts should not make a contract for the parties. Unquestionably, the parties through direct negotiations could have come up with a better solution than the court. However, they did not do so. We are not making a contract for the parties. The parties made this contract in 1952, and we are only providing a remedy where subsequent changes not reasonably foreseeable by the parties have rendered the contract unconscionable under present circumstances. As pointed out in *Estate of Link*, the rules concerning specific performance are applicable to reformation of a contract, as are the remedies available under the Uniform Commercial Code as a guide to fashion an equitable remedy.

We do not agree with the district court's finding that there was "no meeting of the minds" in anticipation of these increases in costs and market price; rather, we find such increases were not anticipated or reasonably foreseeable and thus render the

contract unconscionable. To enforce the original contract would work a substantial hardship on the plaintiffs and would be unjust. On the other hand, termination of the contract merely shifts the inequities from the plaintiffs to the defendant. The parties entered into a long-term executory contract in which Mesa obtained a long-term supply of natural gas and the plaintiffs initially received an acceptable price for their interest in the gas produced and sold under the contract. The remedy, therefore, should preserve the mutual benefits of this long-term contract under the changed circumstances. The least drastic remedy should be applied which will provide equity and justice to the parties. We note that plaintiffs' cause of action includes, as an alternative to avoiding the contract, a prayer for reformation of the contract to require the defendant to pay market price for the natural gas. We conclude that reformation of the contract, and not termination, is the appropriate remedy which will best preserve to each party the benefits they initially intended and contemplated receiving from the contract.

Mesa also contends that the Baptists do not have standing to seek avoidance or reformation of the contract. Mesa states its issue in terms of standing, but argues it in terms of the real party in interest. Mesa cites to K.S.A. 1992 Supp. 60-217(a), which provides that "[e]very action shall be prosecuted in the name of the real party in interest." The statute also provides:

"No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest."

The present action was jointly initiated by the Kansas Baptist Convention, a party to the 1952 agreement, and the Hugoton Energy Corporation, which purchased the Baptists' mineral rights in 1988.

Mesa argues that the Baptists have no rights to be enforced. In May 1988, they executed a Mineral Deed transferring their mineral estate in the land at issue to Hugoton Energy Corporation. In September 1988, the Baptists executed a Corrected Mineral Deed which changed the transfer from the entire mineral

estate to 90% of the mineral estate of the Baptists. Mesa contends that, even though the Baptists retained 10% mineral ownership, they transferred any and all claims, demands, rights, and causes of action arising out of the 1952 agreement. We find no merit in this argument. In each of the deeds, the Baptists transferred "all claims, demands, rights and causes of action which may have heretofore accrued to grantor as the owner of said mineral estate." A reasonable construction of the Corrected Mineral Deed would be that the "mineral estate" is 90% of the mineral rights which the Baptists held at the time of the 1952 agreement. Thus, the Baptists transferred all causes of action arising out of the 90% portion of the mineral estate, but retained all causes of action arising out of the remaining 10% of the mineral estate.

The district court concluded that Mesa's real party in interest argument became moot "by virtue of a subsequent conveyance from Hugoton Energy Corporation to the Kansas Baptist Convention, a copy of which conveyance is attached to the stipulations filed on January 29, 1991, as Exhibit 'F.' " The document referred to by the district court is neither the Mineral Deed nor the Corrected Mineral Deed. It is titled, "Stipulation and Cross-Conveyance," and it was executed in July 1990, two years after the deeds. We find no error in the district court's conclusion.

Finally, Mesa contends that equitable principles bar the relief sought by the Baptists and/or Hugoton Energy. Although Mesa pled the equitable principles of waiver and estoppel as affirmative defenses, the district court's disposition of the case, according to Mesa, did not include their consideration. It should be noted that the district court made the following finding: "Because the record is void of any evidence reflecting the detriment to the defendant by the time or filing of this lawsuit, the motion [of Mesa] to amend to include laches as a defense is also denied."

The Baptists' lack of diligence is a pivotal point favoring Mesa's argument. Mesa contends that the remedy of rescission is not available to the Baptists due to their lack of diligence, which fits hand-in-glove with their accepting benefits under the contract over a period of years while they delayed prosecuting this action. Mesa relies on *Brown v. Wolberg*, 181 Kan. 919, 317 P.2d 444 (1957). The first syllabus paragraph of that case states: "The equitable remedy of rescission is open only to the diligent, and one

who seeks to rescind a contract on the ground of fraud and misrepresentation must do so with reasonable promptness after discovery of the fraud."

The present action is not premised on fraud or misrepresentation. Nor has Mesa endeavored to show that or how the "diligence rule" of fraud or the statute of limitations for an action on the ground of fraud should be applied in the present case.

Other cases are cited by Mesa for this court's imposing an equitable requirement of "consistency of conduct." We need not discuss these cases in detail because the key is whether the principle for which they have been cited is applicable here. The question is whether the Baptists and/or Hugoton Energy are asserting rights which are inconsistent with their past conduct.

Mesa's theory of inconsistent conduct is that the Baptists have contemplated "breaking the contract" since 1970, but in the meantime continued to accept the benefits of the contract. The parties stipulated that in 1970 the Baptists consulted with an attorney "to determine the feasibility of bringing an action against Mesa concerning the 1952 agreement." They also stipulated that during 1971 and 1972 the Baptists gave periodic consideration to seeking release from the agreement through legal action or renegotiation. This action, however, was not filed until after the 1988 drilling of the additional well completely extinguished any possibility that they would continue to receive benefits.

The Baptists' conduct seems to mark not a shortcoming of conscience so much as unusual forebearance. The contract at issue here is not one under which the parties perform sequentially, nor is it a contract under which performance of any party might be completed in the foreseeable future. It is not as if Mesa had performed, the Baptists accepted the benefit of Mesa's performance, and then the Baptists refused to reciprocate. Mesa's argument lacks merit, particularly when its own request that this court hold the Baptists' feet to the contractual fire after Mesa has reaped enormous profits for years from the gas it has pumped and purchased at their expense is measured against the inconsistent conduct standard. We find no bar exists to preclude the relief sought by the plaintiffs.

In their cross-appeal, plaintiffs seek ½ rather than ⁵⁄₁₆ of the gas produced from the wells drilled on the unit. Plaintiffs argue

that since the district court terminated the contract and the three wells are on the two quarter sections in which plaintiffs own a $\frac{1}{2}$ interest, plaintiffs are entitled to $\frac{1}{2}$ of the gas produced from the wells. In view of our decision that reformation of the contract and not termination is the proper remedy, the cross-appeal becomes moot.

We conclude that, although the district court correctly found the defendant breached the contract, it erred in terminating rather than reforming the contract. Thus, we hold that the decision of the district court must be reversed and the case remanded. Upon remand, the district court must determine to what extent the price and cost terms for drilling and operating of the natural gas wells and for sale of the natural gas should be modified. The district court should fashion a remedy modifying the contract in light of the changed circumstances that have rendered the contract unconscionable. To avoid injustice to the parties, the modification should attempt to preserve the original purpose and expectations of the parties in light of the changed circumstances. Since enforcement of the contract as modified is the appropriate remedy in the present case, it follows that the damages for defendant's breach of the contract must be determined based upon the contract as it is modified by the district court.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded.

ABBOTT, J., not participating.

TERRY L. BULLOCK, district judge, assigned.