In re Harry D. KRUG, Debtor.

**PEOPLES STATE BANK AND TRUST CO., Plaintiff,**

v.

**Harry D. KRUG, Sunflower Bank, N.A., Board of County Commissioners of Russell County, Kansas and Johnny Boyd, Defendants.**

**Bankruptcy No. 93–41762–12.
Adv. No. 94–7006.**

United States Bankruptcy Court,
D. Kansas.

Nov. 21, 1995.

Robert E. Nugent, III, Susan R. Schrag, Wichita, KS, for Plaintiff.

Bruce J. Woner, Timothy Girard, Topeka, KS, for Debtor/Defendant Krug.

Jerry E. Driscoll, Russell, KS, for Defendant Sunflower Bank.

Peter R. Williams, Russell, KS, for Defendant Board of County Comm. of Russell, Kansas.

Kenneth L. Cole, Russell, KS, for Defendant Johnny Boyd.

Eric C. Rajala, Chapter 12 Trustee, Overland Park, KS.

## MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

This litigation arises out of a failed lending relationship between Harry Krug, a cattle rancher, and the Peoples State Bank & Trust Company of Ellinwood, Kansas (PSB). When Krug failed to make timely payments and his financing negotiations with another bank stalled, PSB repossessed most of the cattle and commenced foreclosure proceedings. Krug raised lender liability counterclaims and affirmative defenses in the foreclosure action, contending that PSB wrongfully repossessed and foreclosed, and negligently managed and cared for the repossessed cattle. Krug filed bankruptcy and removed the foreclosure proceeding to bankruptcy court, where the Court denied PSB's motion to abstain, concluding that the issues raised in the foreclosure were substantially the same as the issues raised in Krug's objection to PSB's claim, a core proceeding in the bankruptcy. In addition to the objection to claim and contested foreclosure, the Court heard PSB's motion for determination of secured status and entitlement to interest, fees and expenses as an oversecured creditor, and PSB's counsel's fee and expense applications.

The issues were first narrowed by the Court's Memorandum Opinion and Order granting in part and denying in part the cross summary judgment motions of PSB and Krug.[1] The issues remaining for trial were: (1) the validity and amount of PSB's claim, the affirmative defenses of fraud and equitable estoppel and the counterclaims for impairment of collateral, breach of contract, breach of the duty of good faith and fair dealing, and tortious interference with the Sunflower Bank and McNeal contracts, and the amount of damages, including punitive damages, if any; and (2) a determination of PSB's secured status and PSB's entitlement to interest, fees and expenses pursuant to 11 U.S.C. § 506(b), including the allowance of PSB's counsel's fees and expenses.[2]

---

1. See In re Krug, No. 93–41762–12, Adv. No. 94–7006 (Bankr.D.Kan. May 5, 1995).

2. PSB also presented evidence on its petition for foreclosure. In fixing the amount of PSB's claim, the Court has determined the appropriate amount of PSB's judgment. But, the Court de-

Trial of this matter occurred over a three week period in the summer of 1995. At the close of Krug's case in chief, the Court further narrowed the issues, by granting PSB's motion for judgment and dismissal of the affirmative defenses of fraud and equitable estoppel and the counterclaim for tortious interference with the McNeal contract. The parties have submitted proposed findings of fact and conclusions of law and the remaining matters are now ready for decision.

Based on the evidence, and as further discussed below, the Court concludes that PSB did not breach the duty of good faith and fair dealing, nor tortiously interfere with the Sunflower Bank expectancy, nor commit fraud, nor is PSB equitably estopped from asserting its claim. The Court further concludes, however, that PSB breached its contract with Krug and impaired the cattle in its care, and that Krug suffered damages in the total amount of $47,223.75 from the impairment of collateral, but suffered no damage from the breach of contract. Accordingly, PSB's claim for $328,514.92 is reduced by $47,223.75, leaving an allowed claim in the amount of $281,291.17. The Court concludes that the value of the collateral, $600,000, exceeded the amount of PSB's claim by $318,708.83, and that PSB is entitled to interest and expenses to that extent. The Court specifically allows PSB's post-petition interest in the amount of $11,063.88, and expenses in caring for the cattle in the amount of $70,206.28. The Court further allows PSB's attorneys' fees and expenses in the amount of $97,482.03.

## FINDINGS OF FACT

Harry Krug has been a cattle rancher all of his life. His father started a purebred herd of shorthorns in the 1940s, which he and his father managed together. In the 1960s, 1970s and 1980s, Krug served on various cattle boards and associations and had a number of prize winning cattle. Krug has maintained the herd as a purebred breeding herd, selling female and bull calves as breeding stock to other purebred breeders, and to commercial ranchers. Krug sold steers and cull cows in the commercial market. Until the early 1980s, a substantial number of Krug's breeding cattle were registered. By 1988, only 26 head were registered. Due to Krug's financial problems, he was unable to pay the necessary fees to register the cattle. But, the herd remained purebred and registration eligible, and Krug continued his meticulous breeding practices.

In 1988, PSB refinanced Krug's debt to FDIC, the successor to Home State Bank of Russell. Krug signed four notes to PSB, in the total amount of $285,000 and granted PSB a security interest in some 229 head of cattle, farm machinery and equipment, as well as a mortgage of 880 acres. In 1991, PSB restructured Krug's debt into a $20,000 operating note and a $290,000 capital note. Both notes were secured by the 1988 mortgage as well as a 1991 mortgage on the same land, and a 1991 security agreement granting a security interest in all of Krug's income producing assets, including farm machinery and equipment, crops, and his herd of 224 head of shorthorn cattle.[3]

clines to issue a judgment of foreclosure, as a foreclosure action is based on state law and is not a core proceeding under 28 U.S.C. § 157(b)(2). The Court declined to abstain, finding that the issues in the foreclosure action and in the objection to claim were virtually identical and that expediency dictated that these matters be resolved together. In ruling on the objection to claim, the Court has determined the amount of a foreclosure judgment, but the Court is without authority to enter judgment. This Court's authority is limited to submitting proposed findings of fact and conclusions of law to the United States District Court for entry of judgment. However, at this juncture, the better course is to remand the foreclosure proceeding back to state court, pursuant to 28 U.S.C. § 1452(b). This Court has not granted PSB relief from stay, so

entry of a judgment now is a futile exercise. However, in the event this Court lifts the stay or dismisses this bankruptcy, PSB will be able to return to state court and, using principles of collateral estoppel, seek immediate entry of judgment.

3. The 1988 and 1991 mortgage documents mortgage and convey the following described real property, to wit:
The Southwest Quarter (SW ¼) of Section Seven (7), Township Fifteen (15) South, Range Fourteen (14) West of the Sixth Principal Meridian, in Russell County, Kansas;
The Southeast Quarter (SE ¼) of Section Four (4), Township Fifteen (15) South, Range Fourteen (14) West of the Sixth Principal Meridian, in Russell County, Kansas;

By 1991, Krug's relationship with PSB began to sour. Krug was unhappy that PSB refused to increase his operating line of credit. Krug had advised PSB that he needed additional money to update the registrations on his herd, among other things. Krug began seeking alternative financing. Farmers Home Administration twice rejected applications for guaranteed loans and Federal Land Bank also rejected his loan application. The applications were denied, in part, because of a cloud on the title of the real estate, which a trust had deeded to Krug.

While Krug kept the operating note substantially current, he failed to timely pay the first installment on the capital note, $39,427.00, due December 31, 1991. He paid $31,924.24 of this first installment in January of 1993, and paid the balance of it in May of 1993. Meanwhile, Krug failed to make the second annual payment on the capital note, $39,427.00, due December 31, 1992. PSB wrote several letters to Krug advising him that his payments were delinquent, and by February of 1993, refused to make any further advances on the operating loan. In a letter dated in December of 1992, PSB advised Krug that he was in default, the amount necessary to cure the default, and that he needed to cure the default in twenty days. In a letter dated in February, 1993, PSB similarly advised Krug that he was in default. At the same time, PSB encouraged Krug to seek alternative financing.

In the spring of 1992, Krug began negotiating with Sunflower Bank. These negotiations continued through the first half of 1993. The delay was in part due to the title problem, which was eventually resolved. In the spring of 1993, PSB submitted its own proposal to Sunflower Bank, offering to restructure Krug's capital note and to release its lien on the cattle, crops, machinery and equipment, in exchange for $100,000. Tim Boxberger, then president of Sunflower

Bank, planned to recommend PSB's proposal to the loan committee as soon as he received Krug's 1993 tax return, which was under extension. Boxberger was confident that the loan committee would approve the proposal on his recommendation. During the spring of 1993, Boxberger was in frequent contact with Bob Brandes, president of PSB, and Jerry Meng, a PSB loan officer.

By early June, 1993, however, Meng and Brandes had lost confidence that Krug's negotiations with Sunflower Bank would come to fruition. They were concerned about the lack of progress and Krug's failure to communicate with them or Boxberger. Meng and Brandes were also concerned that Krug had accrued over $50,000 in accounts payable, including money owed for cattle purchases. When Brandes contacted Krug at home on June 10, Krug advised Brandes that he was considering bankruptcy. Meng and Boxberger had several conversations after June 10, expressing concern that Krug had not been in contact with either of them. On June 21, Brandes advised Boxberger that PSB was considering foreclosure. Boxberger was noncommittal, telling Brandes that PSB should do what it had to do. Brandes decided, for several reasons, that PSB should repossess the cattle and foreclose. Krug's 1992 payment was delinquent; his negotiations with Sunflower Bank were at an impasse; he had accumulated $50,000 in accounts payable; and he was considering bankruptcy.

After ascertaining where Krug's cattle were pastured, but without prior notice to Krug, PSB repossessed 265 head of cattle on July 1, 1993, including 35 head belonging to Johnny Boyd, Krug's stepson. PSB inexplicably left 44 head of cattle in Krug's possession. On July 2, 1993, PSB filed a petition for foreclosure, without preacceleration notice or prior notice of Krug's right to media-

The Northwest Quarter (NW ¼) of Section Nine (9), Township Fifteen (15) South, Range Fourteen (14) West of the Sixth Principal Meridian, in Russell County, Kansas;
The Northeast Quarter (NE ¼) of Section Nine (9), Township Fifteen (15) South, Range Fourteen (14) West of the Sixth Principal Meridian, in Russell County, Kansas;

The Southwest Quarter (SW ¼) of Section Four (4), Township Fifteen (15) South, Range Fourteen (14) West of the Sixth Principal Meridian, in Russell County, Kansas; and
The North Half (N ½) of the Southeast Quarter (SE ¼) of Section Seven (7), Township Fifteen (15) South, Range Fourteen (14) West of the Sixth Principal Meridian, in Russell County, Kansas.

tion, as required by the 1991 mortgage.[4] In August, PSB filed another foreclosure action, this time giving notice of mediation. The foreclosure petition stated that the principal and interest due under the notes as of June 22, 1993, was $300,675 in principal plus $19,451.90 in accrued interest, for a total of $320,126.90. By PSB's own admission, at the time of repossession and foreclosure the collateral was worth at least $550,000 and as much as $650,000.

The 1991 security agreement provided in pertinent part, that:

> Secured Party's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if Secured Party exercises reasonable care in physically safekeeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third person, exercises reasonable care in the selection of the bailee or other third person, and Secured Party need not otherwise preserve, protect, insure or care for any Collateral.

At the time of the repossession, Brandes advised Krug that PSB would hold the cattle while Krug obtained alternative financing. The minutes of PSB's loan committee meetings reflect that they hoped that Krug would obtain refinancing by October 15, when PSB's leases of pasture expired. By September 16, however, the loan committee began planning for a sale. PSB received an offer of $192,000 from Mike Ringwald, a cattle rancher. PSB also seriously considered holding a special sale for registered shorthorn cattle. Several sales consultants had advised PSB that by providing onsite registration to buyers, the herd could be sold at registered value, rather than at purebred or commercial value. PSB received an order allowing them to sell the herd, but the sale was stayed when Krug filed a Chapter 12 bankruptcy on October 28, 1993.

PSB did not anticipate caring for the herd past October, but the bankruptcy filing resulted in PSB wintering the cattle. Krug filed a complaint for turnover, which PSB resisted for several months. In April of 1994, the Court ordered PSB to turnover the cattle to Krug. It took Krug approximately six weeks to pick up all of his cattle. Inclement weather, impassable roads and his difficulty in finding suitable pasture all contributed to the delay.

Between July of 1993, and April of 1994, PSB hired several caretakers for the cattle. From July to November, 1993, the cattle were pastured in two locations on the CK Ranch, a large operation with a stellar reputation for cattle management. In November, PSB contracted with Mike Ringwald, an experienced commercial herd rancher, to care for most of the cattle; and with Larry Dannebohm, another experienced commercial rancher, to care for the pregnant cows and heifers through the calving season in the spring of 1994. The minutes of PSB's loan committee meetings reflect that Brandes and Meng were actively involved in the management of the cattle. Meng, Brandes and the caretakers jointly determined what feed, supplements and veterinary services were needed.

The Court heard extensive testimony concerning the care or lack of care, the standard of care, and the condition of the cattle at various pertinent times. Both parties offered expert witnesses on the care and the condition of the cattle. Krug, his friends, and PSB's officers and agents testified, as well. The Court has relied on all of this testimony, giving particular attention to those witnesses whose testimony sounded more objective. PSB tendered one expert whom they billed as objective, Krug's veterinarian, Dr. Thouvenelle. However, Dr. Thouvenelle's testimony and report was more partisan than most. While testifying about Krug's inadequate care of the cattle, he carefully skirted the issue of Ringwald's treatment of the cattle, which most of the other witnesses agreed was inadequate treatment.

When PSB repossessed Krug's cattle on July 1, 1993, the cattle were thin. The cattle

---

4. In its Memorandum Opinion and Order filed May 5, 1995, the Court granted Krug's counterclaim for breach of contract, concluding that the requisite notices were not given prior to foreclosure. The Court reserved for trial the amount of damage, if any, arising from the breach of contract.

had lost weight due to the unusually harsh weather in the winter of 1992–1993, but also because Krug had insufficient funds for adequate feed and nutritional supplements. Although the cattle were still underweight, their condition was improving when they were repossessed on July 1. And, after repossession, their condition continued to improve while they were at CK Ranch. Although the cowboy at CK Ranch testified that he was concerned with the condition of the cattle on July 1, his notes of his periodic inspections did not indicate any such concerns.

By all accounts, the cattle were in good physical condition when they were placed in the custody of Mike Ringwald in November, 1993. Their condition deteriorated on Ringwald's watch. Two healthy heifers died while in Ringwald's possession; three cows had calves that were never accounted for; and Ringwald acknowledged that at least one calf had died. Ringwald underfed the cattle. He penned Krug's cattle in a feeding paddock that contained cattle carcasses and adjoined another feeding pen in which a dead calf was left unattended for several days. Their proximity to the dead calf created a serious risk of disease. Although two of the carcasses were old and no longer presented a risk of disease, the fact that these decomposed carcasses remained in the feed pen illustrates the poor management practices of Mike Ringwald.[5] Ringwald's pens were muddy at times, and pooled in stagnant water. The cattle had footrot, runny eyes and lice, all treatable. Ringwald penned all ages and genders of cattle together, particularly to the detriment of the 1993 calf crop who could not compete with the older cattle at the feed stalls. Ringwald waited too long to wean the 1993 calves. The 1993 bull and heifer calves were underweight and underdeveloped, devaluing them as breeders in the registered or purebred market. Krug testified that as a consequence of their poor development, nine of the 1993 heifers that he

bred for the first time in the fall of 1994, were not impregnated. The steers born in 1993 were each approximately 100 pounds underweight, devaluing them for commercial sale. Sampson, the highest performance bull among Krug's four herd bulls, was injured, possibly in a fight with other bulls kept in the same pasture. Sampson had a throat lesion, couldn't eat, and lost approximately 400 pounds, consequently losing his value as a breeder. Ringwald billed PSB $36,292.20 for his care of the cattle, more than half of the $70,206.28 in total expenses associated with repossessing and caring for the cattle.[6] Ringwald cared for all of the cattle for approximately 2½ months, and for the males and unbred females for an additional 3 months. CK Ranch cared for all of the cattle for 4½ months and Dannebohm cared for the bred females and their born calves for 3½ months.

Thirty-nine (39) of the pregnant cows and heifers were taken to Larry Dannebohm's ranch, for calving, on February 1, 1994. All 39 gave birth to calves, 33 at Dannebohm's place and 6 after Krug picked them up in April or May. Dr. Thouvenelle had pregnancy checked all of the females, but missed some females, whose calves were born at Ringwald's. Nine of the calves born at Ringwald's survived. At least another three inexplicably died at Ringwald's.

Although the 1994 calves were in good physical condition, their lineage was unknown. While the cattle were pastured at CK Ranch, they were bred indiscriminately. Krug had always pastured one bull per pasture, optimizing genetics by matching his bulls with particular cows and heifers. This breeding practice is essential if one wants to record lineage and qualify for registration. At CK Ranch, multiple bulls were bred with multiple females, such that the 1994 calf crop had unknown sires, rendering registration impossible. Although the calves' parentage could have been determined through DNA testing, Dannebohm failed to record the birth

---

5. The Court finds implausible Ringwald's explanation that coyotes or wolves dragged these carcasses into an occupied feeding pen. Rather, it seems more likely that the cattle died in the feeding pen and were left there to rot for a long period of time.

6. These expense figures have been adjusted to deduct the cost of care of Johnny Boyd's cattle that PSB mistakenly repossessed.

weights, essential information for successful marketing of registration eligible calves. Brandes had specifically instructed Dannebohm to record the birth weights, but Dannebohm testified that he thought it unnecessary, and that he considered registered herds a "rich man's sport." In addition to the purebred calves born without recorded lineage, mongrel calves were born. While pastured at CK Ranch, some of Krug's females were accidentally exposed to bulls from neighboring pastures. These calves were not purebred. Thus, the entire 1994 calf crop had no more than commercial value and was rendered useless for breeding stock in Krug's herd.

The cattle had been repossessed at the beginning of the breeding season. Brandes promised to honor Krug's request that the "B" heifers, then a year old, not be bred. Nevertheless, six of the 39 "B" heifers were pastured with a bull, and gave birth in the spring of 1994. Krug testified that these six heifers were bred off cycle, such that he was unable to breed them again in the fall of 1994 for calving in the spring of 1995. Krug failed to establish, however, how he was damaged, since he had the benefit of six calves in the spring of 1994, that he did not anticipate having.

PSB did not pasture the other "B" heifers with a bull. Krug testified that although he did not want these heifers exposed to a bull at the time of repossession, it was his intention to breed them later in the fall of 1993, when they were about 18 months old. However, he acknowledged that he usually waited until the heifers were two years old before breeding them. Furthermore, if Krug wanted these heifers bred at the age of 18 months, he never communicated that to PSB. Shortly after repossession, Krug's counsel demanded that PSB follow Krug's breeding practices, without identifying what those particular breeding practices were. PSB's counsel rebuffed these demands. Thereafter, Krug made no further attempt to disclose his breeding practices to PSB, his first attempt having been rejected. Although PSB was willing to honor Krug's request to not breed the yearling heifers, PSB was apparently not interested in the lineage of the calves in utero, since PSB planned to sell the herd long before calving season.

An eight month old "C" heifer was bred while in PSB's possession. Heifers younger than a year old are too small and underdeveloped to breed.

On PSB's watch, 48 of the exposed females became pregnant, 14 did not. These 14 were older cows, and perhaps cull cows, at or near the end of their breeding life. Krug offered no evidence regarding their fertility.

The Court heard extensive evidence concerning the value of commercial cattle versus the value of registered cattle. Some of PSB's witnesses testified that unregistered, purebred cattle merely have commercial value. Yet, PSB recognized that Krug's cattle could be sold for substantially more, as registration eligible cattle. To that end, PSB planned a sale in which onsite registration was made available. The typical cost of registration is $25 per head. Given the low cost, and the meticulous lineage and performance records kept by Krug, his cattle were more properly valued as registered.

Mike Dugdale, one of PSB's experts, appraised Krug's herd in July, 1994. Dugdale was well qualified to appraise Krug's cattle, since he conducts approximately 40% of the shorthorn auctions in the United States. He valued the entire herd, including the 1994 calf crop at $190,831 commercial value. This included relatively high appraisals of Krug's four bulls, who Dugdale recognized had parentage of national acclaim. He testified that if 60% of the bred heifers and cows were registered, the value of the herd would be $211,431, based on a gross increase of $23,-900 and a discount of $25 per head for registration costs.

Krug assigned a registered value, $650, to the 48 calves born in 1994, for a total registered value of $31,200. Since the calves were not eligible for registration, nor useful as seed stock in his own herd, he sold them as commercial cattle, for a total of $16,306.23. His expert, Alan Sears, estimated the loss at $7400 to $14,800, plus the loss from losing the production value of these calves as seed stock, for a total loss of $28,000. The Court finds that the actual value of the 48 calves

born in 1994 was $28,000 less than what their registered value would have been.

In addition, the Court finds that the value of the three calves that died at Ringwalds was $650 each for a total of $1950. Krug also lost the value of the two heifers who died on PSB's watch, one a 1992 "B" heifer whose registered value was $1300 and one 1993 "C" heifer whose registered value was $750.

Krug sold the young "C" heifer that was impregnated prematurely, fearing that she would die while calving. He sold her in May, 1994, for $316.50, a commercial price based on her weight, discounted for the risk of death while calving. Her registered value was $1000, which was $683.95 more than her actual sales price.

Krug also sold the Sampson bull commercially, since he had lost 400 pounds while in the custody of PSB, would not eat and was no longer suitable for breeding. Sampson was registered, and had a value of $2150, according to Krug; PSB's expert valued him at $2500. Krug sold Sampson for $942.50, which was $1207.50 less than the value Krug assigned to him. In addition, Krug had expended $141.00 in veterinarian expense, for a total of $1348.50.

Krug sold 26 head of 1993 steers that were each about 100 pounds underweight. The steers were sold commercially, as is customary for purebred cattle who are not breeders. They sold for $3010.80 less than what they would have sold for had they been full weight.

The 1993 bulls and "C" heifers were underweight and underdeveloped when Krug regained possession of them, devaluing them as breeding stock. The seven 1993 bulls were on average 300 pounds underweight. Krug sold them at commercial prices based on weight, at an average of $516 per bull. They would have sold for $1000 each in a registered sale, a total difference of $3388. Krug kept the 1993 "C" heifers, placed them

on a conditioning and nutrition program and bred them in 1994. Nine of them failed to calve. Healthy, first time heifers are fertile, unlike older cows that are nearing the end of their period of fertility. Had these nine heifers calved, their calves would have been registration eligible and worth $650 each, for a total of $5557.50.[7] For the same reason, when Krug exposed the 33 unbred "B" heifers for the first time, he expected they would all get pregnant; two did not. These two calves would have had a registered value of $650 for a total of $1235.[8]

The total amount of the above itemized differences between actual sales versus registered values and based on death or weight loss, as well as related veterinary expenses, totals $47,223.75.

PSB established that as of July 10, 1995, the principal and accrued interest on the operating and capital notes were as follows:

### Operating Note

$10,675.00 principal plus $2,507.94 accrued interest

### Capital Note

$290,000.00 principal plus $69,868.69 accrued interest.

PSB's expenses in caring for the 265 head of repossessed cattle and their offspring were:

Pasture and Feed—$53,346.58

Labor—$8979.05

Transportation—$1010.00

Veterinary Expense—$2849.65

Sale Expense—$800.00

Appraisal and Other Expense—$3221.00

For a total amount of $70,206.28.

In addition, PSB has submitted several attorneys' fees and expense applications. PSB claims attorneys' fees and expenses of $243,705.07 through the completion of the trial in July, 1995. Since then, it has submit-

---

7. Krug established that historically he had a calf crop of 95% or more and in some years 100%. The calculations for loss of calves never conceived reflects a 5% discount based on his 95% calf crop rate.

8. Krug calculated his loss as the loss of two registered pairs, but did not establish that he would have sold these two heifers as cow-calf pairs.

ted a supplemental application that includes time and expenses from April through August, 1995, without specifying the total amount in addition to the aforementioned sum.

PSB did not present evidence of the value of its collateral, but submitted that the collateral has been valued between $550,000 and $650,000 at various times. The testimony and exhibits establish that the value of the cattle, as of July, 1993 was $221,875. In a financial statement dated September 8, 1993, Krug had valued the cattle at $201,500, the land at $345,000 and other assets including machinery and equipment and crops at approximately $65,000. For purposes of this hearing, the Court finds that the value of the collateral is $600,000.

### CONCLUSIONS OF LAW

**I. The Allowed Claim.**

The threshold question the Court must consider is the amount of PSB's principal and accrued interest on October 28, 1993. That amount, less any damages awarded to Krug on his counterclaims, serves as the allowed claim for purposes of other determinations, including the secured status of PSB and whether PSB is entitled to postpetition interest and other fees and expenses under § 506(b) of the Bankruptcy Code. The principal and accrued interest on the capital note was $317,121.50 on October 28, 1993; and the principal and accrued interest on the operating note was $11,393.42 on October 28, 1993. The total principal and accrued interest on both notes, as of October 28, 1993, was $328,514.92.

The next question the Court must reach is whether PSB's claim should be reduced to reflect any damages to Krug, arising out of PSB's conduct. In the allowance of claims, upon objection, the Court must determine the amount of the claim as of the date of the filing of the petition, except to the extent that the claim is unenforceable against the debtor and property of the debtor under any agreement or applicable law for a reason other than because such claim is contingent or unmatured. 11 U.S.C. § 502(b)(1).

At issue is Krug's objection to claim, which is synonymous with the counterclaims and

affirmative defenses raised in the foreclosure action. The affirmative defenses have been denied. The remaining matters are Krug's counterclaims and defenses to the claim for: (1) breach of the duty of good faith and fair dealing; (2) tortious interference with the Sunflower Bank expectancy; and (3) damages sustained from PSB's breach of contract, including punitive damages and attorneys' fees.

**A. Breach of duty of good faith and fair dealing**

██ Under Kansas law, there is a duty of good faith and fair dealing in the performance of contractual duties and the enforcement of contractual terms. *Bonanza, Inc. v. McLean,* 242 Kan. 209, 222, 747 P.2d 792 (1987); *Riley State Bank of Riley v. Spillman,* 242 Kan. 696, 706, 750 P.2d 1024 (1988); *Kansas Baptist Convention v. Mesa Operating Ltd. Partnership,* 253 Kan. 717, 725, 864 P.2d 204 (1993). Good faith is determined subjectively, by ascertaining whether the particular party acted with honesty in fact, a difficult evidentiary burden of proof for the complaining party.

██ The record establishes that PSB acted with the requisite subjective honesty in fact and good faith in repossessing and instituting foreclosure. Krug complains that PSB acted dishonestly in repossessing and foreclosing at a time when he was merely $39,000 in default on a $300,000 obligation secured by collateral worth twice that amount. He argues that PSB's dishonesty and bad faith is evident in their taking this action without giving him prior notice and an opportunity to close a deal with Sunflower Bank, or sell sufficient cattle to pay the late payment. Yet, the notes and security agreement authorized PSB to repossess without prior notice to Krug. Furthermore, there is no evidence that PSB repossessed for some improper purpose or sinister motive. It had forborne from taking action on Krug's delinquent payments since December of 1991. Perhaps it waited as long as it did because of the significant equity it had in its collateral. PSB continued to forbear from action the first half of 1993, because Brandes and Meng

hoped that Krug would get financing from Sunflower Bank. In fact, they encouraged Krug's effort, by submitting a workout proposal to Sunflower. Until mid-June, Brandes and Meng thought that their proposal might be accepted. Then Krug became uncommunicative, Boxberger could not assure them that the loan would be approved imminently, and when Brandes finally spoke with Krug, he mentioned that he was considering bankruptcy. Brandes testified that he was also concerned that Krug had been selling some cattle without PSB's prior authorization, and that Krug had accrued $50,000 in accounts payable, including a bill for cattle Krug purchased from a Canadian rancher. Based on all of these factors and concerns, PSB's officers decided to repossess and foreclose. While PSB foreclosed without preacceleration notice, as required by its mortgages, the Court accepts Brandes's testimony that this was due to inadvertence, not any design by PSB to institute foreclosure immediately to interfere with Krug's negotiations with Sunflower Bank or to cause harm to Krug.

There is simply no evidence that PSB acted dishonestly or improperly. There is no evidence of a subjective dishonesty. There is no evidence that PSB intended to deceive, injure, impair or destroy Krug. Krug's arguments that PSB's actions should be construed as dishonest, might be persuasive if under Kansas law the standard was objective good faith. Objectively, despite PSB's right to repossess and foreclose upon delinquent payments or other events of default, one might question the propriety of PSB taking action when it did. It had an equity cushion of 100%. Krug was delinquent on one payment of $39,000. Although the negotiations with Sunflower Bank were stalled or at an impasse, Boxberger at all times indicated that his bank would favorably review PSB's proposal, as soon as they had Krug's tax returns. PSB could have demanded that Krug sell some cattle to make all or part of the $39,000 payment. PSB had a security interest in all of Krug's income producing assets. The repossession of his cattle caused Krug to lose his ability to earn income or to present a positive financial picture to a potential lender.

However, when viewed subjectively, there is nothing to suggest that PSB bore ill will or bad faith. Rather, it is clear that PSB reacted quickly to Krug's threat of bankruptcy. PSB decided that it needed to repossess the cattle. PSB hoped that Krug would still obtain financing, but in the event he did not PSB hoped to sell the cattle. In retrospect, it seems unreasonable that PSB's officers believed that Sunflower Bank would still be interested in PSB's proposal once PSB had possession of the cattle. However, it was not impossible that Sunflower Bank would still favorably entertain PSB's proposal. After all, when Brandes told Boxberger that PSB was considering foreclosure and repossession, Boxberger did not respond that Sunflower Bank would no longer be interested. Boxberger's response was noncommittal, either way.

There was evidence that this was a lending relationship plagued by a lack of communication, tempered by the forbearance by PSB and periodic efforts as well as periodic inaction by Krug. However, there was no evidence of ill will, bad faith or improper conduct by PSB. In fact, the Court is convinced that PSB hoped that Krug would be successful in obtaining other financing.

B. Tortious Interference

■ For the reasons addressed above, the Court grants judgment to PSB on Krug's counterclaim for tortious interference with the Sunflower Bank expectancy. There was simply no evidence that PSB intended to interfere with Krug's prospective contract with Sunflower Bank. The elements of the cause of action for tortious interference with a prospective business advantage or relationship are set out in *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986) (citing *Maxwell v. Southwest Nat'l Bank, Wichita, Kan.*, 593 F.Supp. 250, 253 (D.Kan.1984)):

(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4)

intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct and proximate result of defendant's misconduct.

■ Krug had an expectancy that Sunflower Bank would loan him money, on the terms outlined in PSB's proposal to Sunflower Bank. Based on the testimony of Tim Boxberger, then president of Sunflower Bank, there was a probability that the loan committee would approve his recommendation that PSB's proposal be accepted. Boxberger testified that but for the repossession and foreclosure, it is likely that Sunflower Bank would have approved Krug's loan application. Boxberger was waiting on Krug's 1992 tax return, which was under extension and completed within days after July 1, 1993. However, there was no evidence of intentional misconduct by PSB. There was no evidence that PSB intended to interfere with this expectancy or that it intended to cause harm to Krug.

### C. Breach of Contract

■ The Court previously granted summary judgment to Krug on the counterclaim for breach of contract, holding that PSB breached the contract in two respects. It failed to give preacceleration notice to Krug as required by the 1991 mortgage; and, it failed to give notice of mediation in the foreclosure action as required by K.S.A. 74–545. The Court reserved for trial the issue of Krug's damages from these breaches. However, Krug has failed to establish that PSB's breach of contract proximately caused him any injury. While Krug presented a quantum of evidence concerning impairment of the repossessed cattle and damages flowing from that injury, he presented only a modicum of evidence concerning injury arising out of PSB filing a foreclosure action without giving preacceleration notice or notice of mediation. Krug's theory is that PSB foreclosed prematurely, without first complying with contractual and statutory requirements, but had PSB complied, foreclosure could not have been filed until some time later. In fact, since the contract required PSB to give preacceleration notice that included a 30 day right to cure, Krug argues that had PSB

complied, he would have had sufficient time to submit his tax return to Sunflower, gain acceptance of his loan application, and cure his default with PSB. Thus, Krug argues that PSB's breach of contract proximately caused Krug to file bankruptcy causing him damage to his reputation. The problem with Krug's theory, however, is that while PSB's breach of contract rendered its foreclosure action premature, PSB was entitled to repossess the cattle on July 1, without prior notice of acceleration or mediation. And, PSB presented sufficient evidence that it had a number of reasons to repossess the cattle at that time. Krug did not prove that but for PSB's breach he would not have filed bankruptcy, despite having lost possession of his income producing asset, the cattle. It was the repossession that catapulted Krug into bankruptcy and not the filing of the foreclosure action. Krug lost his means of earning income and his means of securing a workout with PSB and Sunflower. Krug has simply failed to show that the breach of contract proximately caused him injury.

### D. Impairment of Collateral

Krug contends that PSB impaired the cattle by entrusting them to caretakers who rendered substandard care, causing the cattle to die, lose weight, have delayed development as breeders, become infertile, and suffer injury. He contends that the value of his breeding herd and the cattle comprising it was also impaired by PSB's refusal to follow his breeding practices and instructions, and by the failure to observe standard breeding practices for purebred registered herds.

PSB contends that its duty of care is limited to the language in its security agreement, "reasonable care in physically safekeeping such Collateral" or "reasonable care in the selection of the bailee or other third person" chosen by PSB, and PSB "need not otherwise preserve, protect, insure or care for any Collateral." PSB argues that it met its burden by selecting bailees who had sufficient experience to feed, pasture and keep the cattle safe and healthy. PSB further argues that since the security agreement does not describe the cattle as "purebred," "registered" or "registration eligible," the Court

should not entertain parole evidence of PSB's knowledge that Krug treated the herd as such. Krug contends that PSB's duty is higher than physical safekeeping. He contends that PSB had a duty to preserve the bloodlines of his purebred herd and to insure that the calf crop was registration eligible, by following his breeding practices. Krug also contends that PSB and its bailees did not keep the cattle safe and healthy. Krug argues that PSB had a duty under the Uniform Commercial Code to use reasonable care in the custody and preservation of the cattle and the value of the cattle.

K.S.A. 84–9–207 provides that "A secured party must use reasonable care in the custody and preservation of collateral in his possession." In construing this same language in the Uniform Commercial Code as adopted in Oklahoma, the Tenth Circuit Court of Appeals held that "we believe that the word 'preservation' includes preservation of value." *Reed v. Central Nat'l Bank of Alva,* 421 F.2d 113, 117 (10th Cir.1970) (citation omitted). In *Reed,* an Oklahoma bank was the pledgee of convertible debentures as collateral security for a loan. *Id.* at 114. The debentures were called for redemption. *Id.* at 115. The pledgor demanded that the bank convert the debentures to common stock during the period of time in which the pledgor was entitled to convert them. *Id.* The Bank ignored the pledgor's demand, and the value of the debentures fell. *Id.* at 116. The Court held that the bank impaired the pledgor's collateral, by impairing the value of it. *Id.* at 118.

The court went on to hold that although the duty of reasonable care may be modified by agreement of the parties, in so doing, the security agreement must specifically establish the standards of reasonable care applicable to the transaction, and the standards by which the obligations are to be performed. *Id.* at 117. The court cited § 1–102(3) of the Uniform Commercial Code, which was adopted in identical form in Oklahoma and Kansas. *Id.* It states,

> The effect of provisions of this act may be varied by agreement, except as otherwise provided in this act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this act

may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

The security agreement between PSB and Krug does not establish any standards for performance of the duty of reasonable care of physical safekeeping or selection of a bailee or third party. Absent specific standards or guidelines, the Court finds that K.S.A. 84–9–207 controls PSB's duty and that its duty includes reasonable care in the custody and preservation of the cattle and the value of the cattle. This duty encompasses reasonable animal husbandry practices in feeding and caring for the cattle, to keep them healthy and well fed. The duty also includes retaining the value of these particular cattle, which the security agreement describes as "shorthorn" cattle. The cattle were not commercial cattle that were bred, nurtured and sold for weight, but rather they were purebred, registered and registration eligible cattle. Krug's cattle were bred, developed and sold as breeding stock. A number of head were kept in his herd as replacement stock. Krug had maintained this herd for four decades and the lineage of his bulls, as well as some females, were of national acclaim. Krug's herd had a higher value than a commercial herd. PSB's officers testified that they had always valued it as a commercial herd, although they acknowledged that they knew Krug intended to update the registration papers on a number of head. Moreover, PSB understood that it should sell the herd as a registered or purebred herd after repossession. A commercial sale would not be commercially reasonable given the special nature of Krug's cattle. PSB recognized this distinction and was under a duty to treat Krug's cattle accordingly. PSB chose to repossess the cattle at the beginning of the breeding season. PSB exhibited no concern for breeding the cattle in a manner that would insure the registration eligible status of the calf crop. It is clear from the parties' testimony, that PSB hoped that Krug would manage to secure financing and get the cattle back. By that time, however, the damage would have been done. The calves in utero would have been without

lineage. Of course, events did not proceed as PSB hoped or planned. Krug did not get the cattle back right away. PSB was forced to pasture the cattle for 10 months, not 2 months. Yet those are the risks incumbent when a secured party repossesses collateral. The secured party bears the risk that the collateral may depreciate, become injured, lose value. That risk must be weighed against the secured party's actions. Did the secured party act with reasonable care to avoid depreciation, loss of value or injury? Did the secured party take reasonable care to preserve the collateral as the secured party found it?

■ Based on the extensive evidence offered by both parties on these issues, the Court finds that the cattle received substandard care while in the custody of Mike Ringwald. While the cattle were pastured at CK Ranch, from July 1, 1993 to mid November, 1993, they received adequate feed and medical care. Their condition improved during this time period. The cattle were thin when they were repossessed, in part because they were underfed, but more importantly because they had endured an exceptionally brutal winter. Cattle typically are in the worst condition at the end of winter, and when the winter is particularly cold, and available feed is particularly limited, one could expect that cattle will be at their worst, even if they receive optimum care. The Court finds that Krug displayed exceptional cattle management for years and that the relatively poor condition of the cattle at the time of their repossession reflects conditions out of Krug's control, and does not evidence poor management by him.

Once the cattle were transferred to Mike Ringwald's possession, the level of care they received diminished. To be sure, since Ringwald had custody of the cattle during the winter, one could expect that they would not be in the best condition when Krug regained possession of them in April and May. However, it is clear that the cattle in Ringwald's possession were in noticeably worse shape than the cattle in Larry Dannebohm's custody. Even though the cattle in Dannebohm's care had just calved, they were in better condition than the young heifers, steers and

bulls, and the unbred cows housed at Ringwalds. These cattle endured the same weather conditions at Ringwalds and Dannebohms, so any significant difference in their condition must be attributed to the difference in Ringwald's and Dannebohm's management. And, from the evidence presented at trial, Ringwald's management was deficient.

Krug established that the Sampson bull sustained injury on PSB's watch, that the steers were underweight, and that the 1993 heifers and bulls were underweight and underdeveloped, which impaired their fertility. Furthermore, several calves and several heifers died on PSB's watch. The Court is satisfied that these injuries were proximately caused by PSB's negligence and that damages in the amounts set out in the findings of fact should be awarded.

Krug also established that he lost the enhanced registered value of the 1994 calf crop because of PSB's failure to follow the practice, followed by Krug and all registered breeders, of one bull per pasture, in order to match certain bulls with certain females and in order to ascertain the sire of the calves. PSB countered that Krug could have done DNA testing on the calves to determine their sires. This ignores the significance, however, of matching bulls and dames in a breeding herd. By indiscriminately pasturing bulls and females together, PSB ignored the need to maintain blood lines and insure that the cattle are not bred too closely. Furthermore, even if Krug had determined the sires through DNA testing, Dannebohm failed to record the information Krug needed for marketing these calves as registered or registration eligible.

There were other injuries proximately caused by PSB's inattention or lack of concern for the integrity of this breeding herd. A heifer was bred at the age of 8 months, risking her life and the life of the calf in utero. The Court finds that the injury to the integrity of the herd as a registered or registration eligible herd was proximately caused by PSB's negligence and that damages in the amounts set out in the findings of fact should be awarded, in the total amount of $47,223.75.

### E. Punitive Damages and Attorneys' Fees

The Court finds that Krug's request for punitive damages must be denied, in light of the Court's failure to find that the conduct of PSB or its agents constituted fraud, malice, gross negligence or willful and wanton invasion of another's rights. *See Gillespie v. Seymour*, 250 Kan. 123, 144, 823 P.2d 782 (1991) (citation omitted) (finding that in Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs); *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 481, 738 P.2d 1210 (1987) (citations omitted) (holding that punitive damages may be awarded whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy); *see also* K.S.A. 60–3702(c) (providing that the plaintiff shall have the burden of proving, by clear and convincing evidence, that the defendant acted with willful conduct, wanton conduct, fraud or malice); K.S.A. 60–3702(d)(1) (providing that punitive damages shall not be assessed against a principal or employer for the acts of an agent or employee unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the principal or employer).

▮▮▮ Krug has also requested an award of attorneys' fees as damages. In Kansas, the prevailing party is not entitled to recover attorneys' fees unless attorneys' fees are specifically authorized by statute or agreement of the parties. *See Duggan v. Rooney*, 749 F.Supp. 234, 241 (D.Kan.1990) (citing *Wilshire Oil Co. v. Riffe*, 409 F.2d 1277, 1285 (10th Cir.1969), and *Farmers Cas. Co. v. Green*, 390 F.2d 188, 192 (10th Cir.1968)); *Dickinson, Inc. v. Balcor Income Properties Ltd.–II*, 12 Kan.App.2d 395, 399, 745 P.2d 1120 (1987) (citation omitted). Although Krug has not alleged that his attorneys' fees are authorized by statute or agreement, he argues that PSB is responsible for attorneys' fees arising from third party litigation resulting from a breach of contract or tortious act. In *Duggan*, 749 F.Supp. at 241, the court noted that there is an exception to the general rule where the plaintiff has been forced to litigate against a third party because of some tortious conduct of the defendant. Krug then argues that third party litigation includes bankruptcy, citing *Standing v. Midgett*, 850 F.Supp. 396 (E.D.N.C.1993), and *In re Eisele*, 132 B.R. 696 (Bankr.W.D.Pa.1991). The Court finds that these cases do not stand for that proposition. Furthermore, Krug filed bankruptcy as a result of PSB repossessing his income producing assets, not as a result of PSB's breach of contract or impairment of collateral.

Therefore, PSB's claim is allowed in the amount of $281,291.17 [$328,514.92 minus damages of $47,223.75].

### II. The Allowed Secured Claim.

Section 506(a) of the Bankruptcy Code provides that an allowed claim is secured to the extent of the value of such creditor's interest in the estate's interest in such property. There is no dispute that PSB's interest in the estate's interest in the property exceeds the amount of PSB's claim. In other words, on the date of the filing of the petition, PSB's claim, as allowed, was fully secured.

### III. Allowance of § 506(b) interest, fees and expenses.

PSB claims that it is entitled to postpetition interest, a substantial amount of attorneys' fees and expenses, as well as its expenses in repossessing and caring for the cattle. Section 506(b) provides in relevant part that:

> To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

PSB is thus entitled to postpetition interest, as well as reasonable attorneys' fees and reasonable expenses, to the extent that the value of its collateral exceeds the amount of its allowed secured claim. The Court has

found that the value of the collateral on the date of the petition was $600,000 and that PSB's allowed secured claim is $281,291.17. Because § 506(b) allows recovery "to the extent that" the creditor is oversecured, the maximum that PSB is entitled to recover under § 506(b) is $318,708.83. However, this figure should be reduced by $47,223.75, the amount of damages caused by PSB. The available recovery of attorneys' fees and expenses should not increase by virtue of a reduction in PSB's claim arising out of PSB's injurious conduct. *See In re Knedlik,* No. 93–40994, slip. op. at 5–7 (Bankr.D.Kan. Oct. 18, 1995). Therefore, although the difference between the $600,000 value of the collateral and the $281,291.17 amount of principal and prepetition interest would ordinarily determine the maximum available for postpetition interest, expenses and attorneys' fees and expenses under § 506(b); in this case, the maximum § 506(b) recovery should be reduced by the amount of damages, $47,223.75. Therefore, the maximum § 506(b) recovery here is $271,485.08.

PSB has incurred postpetition interest, as of July 10, 1995, in the amount of $11,063.88, which the Court will allow in full. PSB also claims $70,206.28 in total expenses for repossessing and caring for the cattle, as well as expenses associated with preparing the cattle for sale. The parties chose to submit on briefs, the question of the reasonableness of PSB's expenditures. Krug had no persuasive objection to these particular expenses. Despite PSB's negligence in failing to follow Krug's breeding practices and Ringwald's substandard care, the Court is satisfied that PSB expended these sums on nutrients, veterinarian care, labor, pasture leases, transportation and sale expenses. PSB reduced its expenses pro rata for the 35 head of cattle owned by Johnny Boyd and it is not seeking recovery of that sum in this proceeding. Accordingly, the Court will allow PSB's claim for $70,206.28 in expenses for caring for and repossessing the cattle.

PSB has also submitted applications for attorneys' fees and expenses totaling $243,-705.07, through July, 1995. Since then, PSB has submitted a supplemental application that fails to identify the total additional amount it is claiming. PSB bears the burden of proving the reasonableness of the fees, which can only by done by presentation of carefully detailed applications and supporting documentation. *In re Dalessio,* 74 B.R. 721, 724 (9th Cir. BAP 1987) (citation omitted). Therefore, the Court will deny the supplemental application in its entirety.

■ Under § 506(b), there are four requirements a creditor must satisfy before its fees and costs will be allowed as part of its claim: "(1) the creditor must have an allowed secured claim; (2) the creditor's security agreement must provide for the requested fees; (3) the creditor must be oversecured; and (4) the fees requested must be 'reasonable'." *In re Josephs,* 108 B.R. 654, 656 (Bankr.N.D.Ill.1989). The first three requirements have been met in this case. The security agreement under which PSB's claim arose provides for payment of reasonable attorneys' fees and expenses, including those incurred "in the satisfaction, protection, defense and enforcement" of the security agreement or security interest, and including those incurred in any litigation or bankruptcy proceeding.

■ Therefore, the only issue for the Court to determine is whether the attorneys' fees and expenses are "reasonable." Bankruptcy courts have broad discretion to determine what constitutes reasonable fees and expenses. *Id.* (citations omitted). The Court must determine whether, "considering all relevant factors including duplication, the creditor reasonably believed that the services employed were necessary to protect his interests in the debtor's property." *In re Dalessio,* 74 B.R. 721, 723 (9th Cir. BAP 1987) (citation omitted).

Krug objects to PSB's attorneys' fees and expenses in total, contending that they are unreasonably high. At the outset, the Court notes that although it extensively reviewed the applications, it too is troubled by the bottom line. At the time Krug filed bankruptcy and certainly at the time PSB repossessed and foreclosed, PSB was oversecured by approximately 87% of the amount of its principal and interest. The principal and interest was approximately $320,000; the collateral was worth approximately $600,000.

Thus, PSB had an equity cushion of approximately $280,000. From July 1, 1993 to the end of July 1995, PSB proceeded to defend its $320,000 claim, by incurring attorneys' fees and expenses of more than $243,000. This does not include the $70,000 it expended in repossessing and caring for the cattle. When the Court looks at the totality of circumstances, it seems quite unreasonable to expend $313,000 to protect $320,000, that was otherwise protected by an equity cushion of approximately $280,000. *See In re Nicfur–Cruz Realty Corp.,* 50 B.R. 162, 169 (Bankr. S.D.N.Y.1985) (finding that where the creditor sought over $25,000 in attorneys' fees to protect his $160,000 mortgage with an apparent equity cushion of $75,000 to $140,000, it is inherently unreasonable to ask a debtor to reimburse attorneys' fees incurred by a creditor that are not cost-justified either by the economics of the situation or necessary to preservation of the creditor's interest).

This has been an acrimonious, litigious matter. Krug raised a host of lender liability claims in the foreclosure and in this bankruptcy, seeking to defeat PSB's claim entirely. For the time period of November 1993 through December 1994, Krug's fee applications totaled $76,253.16. For the same time period, PSB requested fees and expenses totaling $130,811.55. Krug's posture certainly justified an aggressive posture by PSB. However, at some point, advocacy overcomes reason. And, when that point is reached, the debtor should not have to bear the cost of the creditor's unreasonable pursuit. *See, e.g., In re Dalessio,* 74 B.R. 721, 723 (9th Cir. BAP 1987) (noting that the court should not reward a creditor whose overly aggressive attorney harasses and opposes the debtor at every stage of the bankruptcy proceeding, nor should the creditor be given a blank check to incur fees and costs which will automatically be reimbursed out of its collateral); *In re Josephs,* 108 B.R. 654, 656–57 (Bankr. N.D.Ill.1989) (noting that courts have frequently disallowed or reduced fees sought by a secured creditor on finding that the legal work was unnecessary or excessive). In this case, PSB incurred a significant amount of attorneys' fees and expenses filing three motions for relief from stay, despite the substantial equity cushion. The first of these

motions was filed on November 10, just 13 days after Krug filed his bankruptcy petition. At some point, PSB's argument became that the equity had dissipated in light of the accruing interest, fees and expenses. Similarly, PSB objected to every cash collateral motion filed by the Krug, despite the equity cushion and Krug's offers of replacement liens on new cattle. The Court simply cannot countenance fees and expenses for this particular activity. Furthermore, the unreasonableness of the fees is demonstrated by comparing PSB's fee request with Krug's fee request for the same time period. In the first 13 months of Krug's bankruptcy, Krug incurred $76,000 in attorneys' fees and expenses for representing him in the entire bankruptcy proceeding, while PSB incurred $130,000. Krug not only had to contend with PSB's various motions and objections, but had to deal with other creditors. In addition, Krug had to comply with all of the statutory requirements of debtors in possession, including monthly reporting obligations. PSB's fees are excessive and unreasonable, since they exceed Krug's fees by more than 70% in the first year of the bankruptcy.

Furthermore, there is $7,903.33 of expenses that are not allowed for failure to comply with this Court's fee and expense guidelines. These expenses include special process server fees for service on PSB's expert witnesses, ordinary copying, postage and phone expenses, courier expenses, facsimile and overnight mail service, and expenses for overtime. Other expenses exceed the bounds of reasonableness on their face, to wit: $1200 charge for chartered airplane flight to western Kansas; a number of travel expenses claimed by two attorneys and one paralegal who traveled from Wichita to Topeka, but did not always share transportation.

PSB's application also fails to identify the various hourly rates of the attorneys and/or paralegals, nor provide the actual dollar charge for each time entry, as this Court requires. Thus, it is difficult to determine the reasonableness of many particular time entries. Again, the Court notes that PSB bears the burden of proving the reasonableness of the fees, which can only be done by presentation of carefully detailed applications

and supporting documentation. *In re Dalessio,* 74 B.R. 721, 724 (9th Cir. BAP 1987) (citation omitted). One thing is clear, however. When viewed in its entirety, the requested fees and expenses exceed reason. In addition to disallowing fees and expenses on a line by line basis, the Court can reduce fees pursuant to a discount from hourly rate to the extent the Court finds the efforts were unnecessary to protect a legitimate interest of the secured creditor in the bankruptcy proceedings. *See In re Wonder Corp. of America,* 72 B.R. 580, 592 (Bankr.D.Conn. 1987), *aff'd* 82 B.R. 186 (D.Conn.1988) (holding that in order to reduce fees to a level allowable under § 506(b), the 1,737 remaining hours must be discounted by a factor of 66⅔% for two creditors and 75% for the third). For all of the above stated reasons, the Court disallows the fee application by 60%, and allows $97,482.03 in fees and expenses.

IT IS THEREFORE ORDERED BY THE COURT that judgment shall be rendered for PSB on Krug's counterclaims for breach of the duty of good faith and fair dealing, tortious interference, fraud and equitable estoppel.

IT IS FURTHER ORDERED BY THE COURT that PSB breached its contract with Krug and impaired the cattle in its care, and that Krug suffered damages in the total amount of $47,223.75 from the impairment of collateral, but suffered no damage from the breach of contract.

IT IS FURTHER ORDERED BY THE COURT that PSB has an allowed claim in the amount of $281,291.17. PSB is also allowed post-petition interest in the amount of $11,063.88, and expenses in caring for the cattle in the amount of $70,206.28. The Court further allows PSB's attorneys' fees and expenses in the amount of $97,482.03.

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.